AO 106 (Rev 04/10) Application for a Search Warrant

HH

# UNITED STATES DISTRICT COURT

for the

Southern District of Ohio

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*
Content and records relating to the Google accounts
associated with the email address rick53ohio@gmail.com
that are stored at premises controlled by Google, Inc. 1600
Amphitheatre Parkway, Mountain View, CA 94043

Case No. 2:20-mj-517

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

SEE ATTACHMENT B INCORPORATED HEREIN BY REFERENCE

located in the _____Northern_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized)*:

SEE ATTACHMENT A INCORPORATED HEREIN BY REFERENCE

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 USC 2251(a) & (e) | Use of a minor engaged in sexually explicit conduct for the purposes of producing a visual depiction of such conduct, or attempt to do so. |
| 18 U.S.C. 2422(b) | Attempted coercion/enticement of a minor for illegal sexual activity |
| 18 USC 2252 | Receipt and attempted receipt of child pornography |

The application is based on these facts:

SEE ATTACHED AFFIDAVIT INCORPORATED HEREIN BY REFERENCE

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Jeff Zech, TFO HSI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 7-24-20

*Judge's signature*

City and state: Columbus, Ohio

Chelsey M. Vascura, U.S. Magistrate Judge
*Printed name and title*

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT, EASTERN DIVISION OF OHIO

| | |
|---|---|
| In the Matter of the Search of: ) | |
| ) | |
| **Content and records relating to the Google** ) | Case No. |
| **accounts associated with the email address** ) | |
| <u>rick53ohio@gmail.com</u> ) | |
| **which are stored at premises controlled** ) | Magistrate Judge: |
| **by Google, Inc. 1600 Amphitheatre Parkway,** ) | |
| **Mountain View, CA 94043** ) | |

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Homeland Security Investigations Task Force Officer Jeff Zech, being first duly sworn, hereby depose and state as follows:

## I. INTRODUCTION AND AGENT BACKGROUND

1.      I, Task Force Officer Jeff Zech, make this affidavit in support of a warrant to search for information associated with a certain account that is stored at the premises owned, maintained, controlled, or operated Google, Inc., an Electronic Communications Service Provider and Remote Computing Service Provider headquartered at 1600 Amphitheatre Parkway, Mountain View, California 94043, believing evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Sections 2251, 2252 and 2422(b), are located within said subject account. The information to be searched is described in the following paragraphs and in Attachment B. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Google, Inc. to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment A. Upon receipt of the information described in Section I of Attachment A, government-authorized persons will review that information to locate the items described in Section II of Attachment A.

2.      I have been employed as a deputy sheriff with the Franklin County Sheriff's Office since July 2006. I am currently assigned to the Franklin County Internet Crimes Against Children (ICAC) Task Force and as a Task Force Officer ("TFO") with Homeland Security Investigations ("HSI") in Columbus, Ohio. I am primarily responsible for investigating internet crimes against

children including the online exploitation of children.  During my career as a deputy sheriff and TFO, I have participated in various investigations of computer-related offenses and have executed numerous search warrants, including those involving searches and seizures of computers, computer equipment, software, and electronically stored information.  I have received both formal and informal training in the detection and investigation of computer-related offenses.  As part of my duties as a deputy sheriff and task force officer, I investigate criminal violations relating to child exploitation and child pornography including the online enticement of minors and the illegal distribution, transmission, receipt, possession, and production of child pornography, in violation of 18 U.S.C. §§ 2252, 2252A, 2251 and 2422.

3.     As a task force officer, I am authorized to investigate violations of laws of the United States and to execute warrants issued under the authority of the United States.

4.     The facts set forth in this affidavit are based on my personal knowledge, observations, experience, and investigation as well as the knowledge, experience, and investigative findings of others.  Since this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation.  I have set forth only the facts that I believe are necessary to establish probable cause that the Google accounts associated with the email addresses **rick53ohio@gmail.com** (hereinafter referred to as the "SUBJECT ACCOUNT") was used in committing violations and contains evidence, fruits and instrumentalities of violations of Title 18, United States Code, Sections 2251, 2252 and 2422(b).  I have not omitted any facts that would negate probable cause.

5.     This affidavit is submitted in connection with an investigation into the attempted production and receipt of material involving minors engaged in sexually explicit conduct, and the attempted coercion or enticement of a minor to engage in illegal sexual activity.  Based on my training and experience, the training and experience of other officers with whom I have communicated, and the facts as set forth in this affidavit, there is probable cause to believe that Larry Richard DICKERSON has committed violations of 18 U.S.C. §§ 2251, 2252, and/or 2422(b).  There is also probable cause that contained within the information associated with the Google, Inc. accounts described in Attachment B there will be found evidence, instrumentalities, contraband, and fruits of these crimes, as further described in Attachment A.

## II. JURISDICTION

6.      Pursuant to 18 U.S.C. § 2703(a), (b)(1)(A) & (c)(1)(A), the United States may require a provider of an electronic communications service or remote computing service, such as the Provider, to disclose all stored content and all non-content records or other information pertaining to subscribers, by obtaining a warrant issued using the procedures described in Federal Rule of Criminal Procedure 41.

7.      This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## III. APPLICABLE STATUTES AND DEFINITIONS

8.      Title 18 United States Code, Section 2251(a) makes it a federal crime for any person to employ, use, persuade, induce, entice, or coerce any minor to engage in, or have a minor assist any other person to engage in, any sexually explicit conduct for the purpose of producing any visual depiction of such conduct, if such person knows or has reason to know that either the visual depiction will be transported or transmitted via a facility of interstate or foreign commerce or in or affecting interstate or foreign commerce or mailed, or that the visual depiction was produced or transmitted using materials that have been mailed, shipped, or transported in or affecting interstate or foreign commerce, or that the visual depiction has actually been transported or transmitted using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce. Subsection (e) of this provision further prohibits conspiracies or attempts to engage in such acts.

9.      Title 18, United States Code, Section 2252, makes it a federal crime for any person to knowingly receive, distribute or possess any visual depiction of a minor engaging in sexually explicit conduct, if such receipt, distribution or possession utilized a means or facility of interstate commerce, or if such visual depiction has been mailed, shipped or transported in or affecting interstate or foreign commerce. This section also prohibits reproduction for distribution of any visual depiction of a minor engaging in sexually explicit conduct, if such reproduction utilizes any means or facility of interstate or foreign commerce, or is in or affecting

3

interstate commerce, as well as any attempts or conspiracies to commit any of the proscribed offenses.

10.    Title 18 United States Code § 2422(b) makes it a federal crime for any person to knowingly use a means of interstate commerce to persuade, induce, entice, or coerce or attempt to persuade, induce, entice or coerce, any individual who has not attained the age of 18 years, to engage in any sexual activity for which any person may be charged with a crime.

11.    Pursuant to Ohio Revised Code Section 2907.04, it is a felony under the laws of Ohio for any person to engage in sexual conduct with another, who is not the spouse of the offender, when the offender knows the other person is thirteen years or older but less than sixteen years of age. Sexual conduct is defined pursuant to O.R.C. § 2907.01 to include vaginal and oral sexual intercourse.

12.    As it used in 18 U.S.C. §§ 2251 and 2252, the term "sexually explicit conduct" is defined in 18 U.S.C. § 2256(2)(A) as: actual or simulated: sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; bestiality; masturbation; sadistic or masochistic abuse; or lascivious exhibition of the genitals or pubic area of any person.

13.    The below terms are defined as follows:

    A. "minor" means any person under the age of eighteen years, pursuant to 18 U.S.C. § 2256(1);

    B. "visual depiction" includes undeveloped film and videotape, and data stored on computer disk or by electronic means which is capable of conversion into a visual image, pursuant to 18 U.S.C. § 2256(5);

    C. "computer"[1] is defined in 18 U.S.C. § 1030(e)(1) as an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device.

14.    The terms "records," "documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade form

---

[1] The term "computer" is used throughout this affidavit and any Attachments hereto refer not only to traditional laptop and desktop computers, but also to internet-capable devices such as cellular phones and tablets. Where the capabilities of these devices differ from that of a traditional computer, they are discussed separately and distinctly.

(such as writings), photographic form (including, but not limited to, microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies), mechanical form (such as printing or typing) or electrical, electronic or magnetic form (such as any and all digital data files and printouts or readouts from any magnetic, electrical or electronic storage device).

15. "Internet Service Providers" (ISPs), as used herein, are commercial organizations that are in business to provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers including access to the Internet, web hosting, email, remote storage, and co-location of computers and other communications equipment.

16. "Internet Protocol address" (IP address), as used herein, is a code made up of numbers separated by dots that identifies a particular computer on the Internet. Every computer requires an IP address to connect to the Internet. IP addresses can be dynamic, meaning that the ISP assigns a different unique number to a computer every time it accesses the Internet. IP addresses might also be static, if an ISP assigns a user's computer a particular IP address which is used each time the computer accesses the Internet.

## IV. BACKGROUND INFORMATION REGARDING THE INTERNET AND GOOGLE

17. I have had both training and experience in the investigation of computer-related crimes. Based on my training, experience and conversations with other officers, I know the following:

18. The Internet is a worldwide network of computer systems operated by governmental entities, corporations, and universities. With a computer connected to the Internet, an individual computer user can make electronic contact with millions of computers around the world. Many individual computer users and businesses obtain their access to the Internet through businesses known as Internet Service Providers ("ISPs"). ISPs provide their customers with access to the Internet using telephone or other telecommunications lines; provide Internet e-mail accounts that allow users to communicate with other Internet users by sending and receiving electronic messages through the ISPs' servers; remotely store electronic files on their customers' behalf; and may provide other services unique to each particular ISP. ISPs maintain records pertaining to the individuals or companies that have subscriber accounts with the ISP. Those records may include identifying and billing information, account access information in the form of log files, e-mail transaction information, posting information, account application information, Internet

Protocol addresses and other information both in computer data format and in written record format.

19.     Computers and the internet have revolutionized the way in which child pornography is produced, distributed, and utilized.  It has also revolutionized the way in which those who have a sexual interest in children interact with each other and with minors.  Specifically, the development of computers and the internet have added to the methods used by those with a sexual interest in children to interact with and sexually exploit children or to seek out or obtain child pornography.  Computers and the internet serve four functions in connection with child pornography and the sexual exploitation of minors.  These are production, communication, distribution, and storage.

20.     Internet-based communication structures are ideal for the child pornography collector or those seeking to sexually exploit children.  Having both open as well as anonymous communication capability allows the user to locate others of similar inclination and still maintain their anonymity, or to hide their true identity when seeking out minors online.  Once contact has been established, it is then possible to send messages and graphic images to other trusted child pornography collectors, or to convince a child to send sexually oriented images or meet for the purpose of sexual activity.  Individuals seeking to engage in such activities can use standard Internet connections, such as those provided by businesses, universities, and government agencies, to communicate with each other and to distribute pornography.  These communication links allow contacts around the world as easily as calling next door.  Additionally, these communications can be quick, relatively secure, and as anonymous as desired.

21.     Collectors and distributors of child pornography also use online resources to retrieve and store child pornography, including services offered by Internet Portals such as Yahoo! and Google, Inc., among others.  The online services allow a user to set up an account with a remote computing service that provides e-mail services as well as electronic storage of computer files in any variety of formats.  A user can set up an online storage account from any computer with access to the Internet.

22.     Through my training and experience, I have learned that Google, Inc. (hereinafter "Google") provides a variety of on-line services, including electronic mail ("e-mail") access, to the general public.  Google allows subscribers to obtain e-mail accounts at the domain name "gmail.com" like the e-mail account listed in Attachment A.  Subscribers obtain an account by

6

registering with Google. During the registration process, Google asks subscribers to provide basic personal information. Therefore, the computers of Google are likely to contain stored electronic communications and information concerning subscribers and their use of Google services, such as account access information, e-mail transaction information, and account application information.

23.     In general, an e-mail that is sent to a Google subscriber is stored in the subscriber's "Inbox" on Google servers until the subscriber deletes the e-mail. If the subscriber does not delete the message, the message can remain on Google's servers indefinitely. The user can move and store messages in and out of user created folders. In recent years, Google and other e-mail providers have provided their users with larger storage capabilities associated with the user's e-mail account. According to Google's online G Suite Learning Center, users can consume up to 30 GB of free e-mail storage. Based on my own experience, and conversations with more experienced law enforcement officers, I have learned that search warrants for e-mail accounts and computer systems have revealed stored e-mails sent and/or received many years prior to the date of the search.

24.     When the subscriber sends an e-mail, it is initiated at the user's computer or hand held/mobile device, transferred via the Internet to Google's servers, and then transmitted to its end destination. Google often saves a copy of the e-mail sent. Unless the sender of the e-mail specifically deletes the e-mail from the Google server, the e-mail can remain on the system indefinitely.

25.     A sent or received e-mail typically includes the content of the message, any attachments to the message (such as images, documents or videos), source and destination addresses, the date and time at which the e-mail was sent, and the size and length of the e-mail. If an e-mail user writes a draft message but does not send it, that message may also be saved by Google but may not include all of these categories of data.

26.     A Google subscriber can also store files, including e-mails, notes, address books, contact or buddy lists, calendar data, pictures, and other files on servers maintained and/or owned by Google. Subscribers to Google might not store copies of these e-mails on their home computers. This is particularly true when they access their Google account through a web browser, or if they do not wish to maintain particular e-mails or files in their residence.

27.     In general, e-mail providers like Google ask each of their subscribers to provide certain personal identifying information when registering for an e-mail account. This information could include the subscriber's full name, physical address, telephone numbers and other identifiers, such as alternate e-mail addresses, and for paying subscribers, the means and source of payment (including any credit or bank account number).

28.     E-mail providers typically retain certain transaction information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of log-in (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via Google's website), and other log files that reflect usage of the account. In addition, e-mail providers often have records of the IP address used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the e-mail account.

29.     In some cases, e-mail account users will communicate directly with an e-mail provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. E-mail providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

30.     In my training and experience, evidence of who was using an e-mail account may be found in address books, contact or buddy lists, e-mail in the account, and attachments to e-mails, including pictures and files.

31.     Google Plus (stylized as Google+) is an internet-based social network owned and operated by Google. The following paragraphs detail the features and functions associated with Google Plus social networking accounts.

     a.     **User Profile -** a Google Plus user profile is a publicly visible account of a user that is attached to many Google properties. The user profile includes basic social networking services like a profile photo, about section, background photo, cover photo, previous work and school history, interests, places lived and an area to post status updates.

b.   **Circles** – Circles enables a user to organize people into groups or lists for sharing across various Google products and services. Organization of Circles is done through a "drag and drop" interface. Once a Circle is created, a Google Plus user can share specific private content to only that circle.

c.   **Stream** – Within the Stream section, Google Plus users see updates from those in their Circles. There is an input box which allows users to enter a post. Along with the text field there are icons to upload and share photos and videos.

d.   **Privacy** – The privacy setting allows Google Plus users to disclose certain information to the circles of their choice. Users can also see their profile visitors.

32.   Google Plus also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Google Plus, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Google Plus profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

33.   Social networking providers like Google Plus typically retain additional information about their user's accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Google Plus users may communicate directly with Google about issues relating to their account(s), such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Google Plus typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communication.

34.   Therefore, the computers of Google are likely to contain all the material just described, including stored electronic communications and information concerning subscribers and their use of Google Plus, such as account access information, transaction information, and account application.

35.   Google Drive is a file storage and synchronization service developed by Google. Google Drive allows users to store files on their servers, synchronize files across devices and share files.

Google Drive offers users 15 gigabytes of free storage with virtually unlimited storage space through an optional paid plan. Digital files uploaded can be up to 5 terabytes in size.

36.     Google Drive users have the ability to upload any digital file to Google Drive for data retention and data backup. Google Drive users have the ability to access their Google Drive account from any device connected to the internet, including computers, tablets, Android smartphones or iPhones.

37.     Your affiant conducted further investigative research into Gmail, Google Plus and Google Drive. Your affiant has learned that these Google products, and others, can all be backed up and synchronized with each other. The back-up and synchronization process creates additional copies of digital files in multiple locations for ease of access and to secure data from accidental deletion.

## V.  INVESTIGATION AND PROBABLE CAUSE

38.     In May of 2020, Officer Sarah Rannebarger with the Franklin County ICAC Task Force was conducting undercover online chats to identify individuals who were attempting to solicit and engage in sexual activity with children under the age of 18 years old. Officer Rannebarger was posing as a 15-year-old girl named "Harper" on the dating application, Skout.

39.     On May 18, 2020, Officer Rannebarger received a private message from an individual utilizing the Skout user name "PoneyPecker," who was later identified as Larry Richard DICKERSON.  DICKERSON asked Officer Rannebarger what she was looking for, and Officer Rannebarger replied, "Idk friends." DICKERSON suggested that he was looking for the same or "fwb or sugar daddy type thing" and asked if Officer Rannebarger was interested in continuing to communicate.

40.     Officer Rannebager replied the following day indicating that she wanted to talk to DICKERSON and asking what he meant by a sugar daddy.  She also asked if DICKERSON was "okay with younger."  DICKERSON replied, "I'm fine with younger. I mean a sugar daddy could be a mentor in life or even financial help. Or just a really good friend help guide you thru life. What would you like. And do you mind older?"  Officer Rannebarger confirmed that she did not mind that DICKERSON was older, they then discussed that Officer Rannebarger lived in Pickerington and their plans for the evening.  DICKERSON then provided a phone number of 740-475-9219 and stated his name was "Rick".

10

41.    Officer Rannebarger sent a text message to the number "Rick" had provided, saying "Hey it's Harper."    After a brief conversation, DICKERSON asked how old Officer Rannebarger was, stated that he was 48 years old, and asked if Officer Rannebarger lived with her parents. Officer Rannebarger informed DICKERSON that she was 15 and lived with her mother. DICKERSON replied, "Cool so you would not get me in trouble." Officer Rannebarger stated she wouldn't as long as he was nice and there were no problems. DICKERSON asked, "Ok. Have you ever met or dated guys my age." Officer Rannebarger told DICKERSON that she had dated a 20 year old. DICKERSON then inquired how Officer Rannebarger was able to get out of the house and if her mother was strict.  Officer, Rannebarger then stated that her mom stays at her boyfriend's a lot. DICKERSON then brought up the idea of them meeting, and Officer Rannebarger said they could meet "whenever she's at her bfs haha."  DICKERSON then requested a picture of Officer Rannebarger, and she sent the below image of her face:



42.    DICKERSON replied, "Your gorgeous... Tell your mom to go get laid so we can meet lol." Officer Rannebarger asked, "what would we do?" DICKERSON replied, "Anything your ok with... What would you like to do. Be honest." Officer Rannebarger replied that she didn't

11

care so long as it was something fun. DICKERSON asked Officer Rannebarger what was fun for her, and Officer Rannebarger replied, "Idk What do you normally do for fun?" DICKERSON responded, "Go eat watch movies and sex if the other person likes it…Wbu?" Officer Rannebarger agreed that DICKERSON's ideas sounded like fun, and DICKERSON responded, "Which can we do since we can't really go out in public…Wanna call me."

43. Officer Rannebarger called DICKERSON as he requested, and he began inquiring about where her mother was and what she was doing. Officer Rannebarger explained that her mother was going to be staying at her boyfriend's house in Ashville, Ohio the following day, and she would be home alone all night. DICKERSON asked if they hung out would it be in her room and asked if she would be "nervous about that." When Officer Rannebarger stated she didn't have a lot of experience, DICKERSON suggested that there was only one way to help that and asked about her previous sexual experience with her ex-boyfriend. He inquired what they would do and what she would be wearing if they met the following day, and described himself as "a little bit of a freak." When asked why, he explained that it was because of the age difference between them. DICKERSON continued to pressure Officer Rannebarger to send nude photos of herself, despite her stating she had a bad experience doing so in the past. DICKERSON then informed her that he would delete the pictures because otherwise he would go to prison, and she would be grounded. He continued with the request, saying that if he "got a couple of pictures," he would feel more comfortable talking about what he wanted to do with her. DICKERSON then explained that he was worried about "cops" and asked her to just send some pictures.

44. Once the phone call ended, DICKERSON sent a text message to Officer Rannebarger again asking her about sending pictures. Officer Rannebarger replied indicating that she would send pictures but had to help her mom at that moment. After several additional questions from DICKERSON about sending pictures, Officer Rannebager sent an image of herself sitting in front of a mirror with "Rick" handwritten in red marker on a paper and an image of her face. Officer Rannebarger then stated she was going to bed. DICKERSON replied, "Do a quick nude and I'll trust the hell out of you. Hope you can text while your in bed…You amazing looking…Love to hear a goodnight…Are you sure about Tomorrow." Officer Rannebarger stated she was about to fall asleep, and DICKERSON replied, "Aww good night…I want a pic of you and what you will sleep in if I'm there...Ok good night."

45.     On May 20, DICKERSON reached out to Officer Rannebarger again and asked if she slept well and what she had planned for the day.  Officer Rannebarger replied that she was going to be just "hanging out". DICKERSON asked if she had any "alone time," and when she confirmed that she did, DICKERSON suggested that they talk or meet.  Officer Rannebarger asked DICKERSON what they would do if they met, and DICKERSON responded that they could do whatever she wanted, and then continued saying, "You know. I mean I am a guy...Thank you for the pics. Your look amazing."  Officer Rannebarger indicated that she knew DICKERSON was a guy but didn't know what he wanted to do, and DICKERSON reminded her that he needed pictures of her so he could trust her.  The context of the discussion made clear that he wanted nude photos of her.  DICKERSON then asked for Officer Rannebarger to call him and again reiterated, "I love pics lol...Hint hint."  Officer Rannebarger again stated that she did not feel comfortable sending "risky" photos, to which DICKERSON replied, "Up to you don't send to risky I don't want either of us in trouble...I don't want you to feel uncomfortable either...I'm not sure you would be ok with stuff I would want to do. I really don't want to pressure or uncomfortable."  DICKERSON then asked if Officer Rannebarger wanted to meet that day and asked where she lived. Officer Rannebarger asked DICKERSON about what they would do and told him that her mother was leaving that afternoon.  DICKERSON suggested that they "just meet and see how we get along?"  Officer Rannebarger asked if that was what DICKERSON really wanted to do and DICKERSON replied, "Lol well the trust thing you know." Officer Rannebarger asked DICKERSON what he meant by the "trust thing," and DICKERSON explained that, "Guys get in trouble all the time. When is your birthday."  He then went on to explain that, "I guess I'm super worried about what could happen. I'm sorry." Officer Rannebarger ensured that nothing bad would happen, and DICKERSON replied, "It's cool I believe you.  Can you bare with me till we meet? Well I guess call sometime if you want." Officer Rannebarger asked what he meant by "bare" with him. DICKERSON replied, "Lol you caught that...Your gorgeous by the way...You dressed yet." Officer Rannebarger reported she was, and DICKERSON replied, "Damn lol."

46.     A short time later, Officer Rannebarger asked DICKERSON what he was doing, and DICKERSON reported he had fallen asleep.  He then returned the conversation to the topic of photos, saying, "You really don't like doing pics do you lol." Officer Rannebarger apologized and explained that she had bad experiences with sending pictures. DICKERSON replied, "Like

you I've had bad experience talking about sex and meeting. We are kinda in the same boat. You can trust that I won't share anything you send me ill delete it immediately I promise and then we can talk about plans for tonight. "

47.     Officer Rannebarger informed DICKERSON that her mother would be leaving at 1:00pm that day and asked DICKERSON what kind of pictures he wanted. DICKERSON replied, "What ever you want to trust me with. And I'll come visit after 1. Where do you live by the way?" Officer Rannebarger said she lived in Pickerington and asked DICKERSON where he lived. DICKERSON stated that he lived in Logan, and continued to ask about pictures. Officer Rannebarger again asked what kind of pictures DICKERSON wanted, and he responded, "The kind that let me know you trust me." Officer Rannebarger asked, "Does that mean naked" DICKERSON replied, "Do you trust me that much?" Officer Rannebarger said that she did trust him, but could not do nudes because of her past. DICKERSON replied, "I know how that feels. I've had bad experience meeting and talking about the stuff. That's why we both have to get over the fear and trust issue." Officer Rannebarger inquired as to why he had a previous bad experience, and DICKERSON explained that he, "Got busted by a mom. A long time ago." DICKERSON then asked if Officer Rannebarger wanted to meet when her mother left. Officer Rannebarger agreed that she wanted to meet and again asked what DICKERSON wanted to do. DICKERSON continued to evade the question, asking Officer Rannebarger what she wanted to do and where would they meet. Officer Rannebarger informed DICKERSON that she lived in an apartment complex and they could meet there.

48.     After further back and forth about what they would do when they met, DICKERSON stated, "Your profile says your 18 so I mean we can do anything. I mean you can't drink legally." Officer Rannebarger replied, "Oh so like 15 going on 18 huh? Haha." DICKERSON replied, "Oh forgot about that lol. I was looking at your profile." Officer Rannebarger explained that the app wouldn't let her use her actual birthday. DICKERSON replied, "Damn how much trouble I could get into if I met a 15 yr old. But your so pretty. When is your birthday. What month." Officer Rannebarger informed DICKERSON that her birthday was in November and asked for his. When DICKERSON said that his birthday was in April, Officer Rannebarger commented about him having a birthday during lockdown and suggested that he could "make up for it now." DICKERSON replied, "You could send me a bday picture present lol. I hope so. That's up to you. Take a pic that shows me how much you want to meet." Officer Rannebarger

then sent an image of herself lying next to a pair of female's underwear. DICKERSON replied, "That's all you want me lol. Take another pic where those panties would be. If you trust me I'll trust you." Officer Rannebarger replied, "Wouldn't they be on the floor?" DICKERSON replied, "I promise to delete what you send and you can check my phone when we meet. Call me."

49.    Once on the phone, DICKERSON asked what apartments she lived in, and she told him the Stratford Lake apartments. He continued to ask what they would do if they met and reiterated that he didn't want to get in trouble. He stated that if he said he wanted to have sex and they met, then he would get in trouble, but that if Officer Rannebarger sent a nude photo he would know she wasn't a cop. He then asked various questions, including how often her mother left, what she liked about sex and what she and her ex did sexually. He told her that she had him both excited and scared, and then continued to pressure her to send a nude photo for him to trust her.

50.    When the text message continued after the phone call, DICKERSON continued to pressure Officer Rannebarger for photos and accused her of not trusting him. When Officer Rannebarger assured him that she trusted him, DICKERSON asked, "Show me how much." Officer Rannebarger replied, "Ugh Idk about the nudes. So if I send a nude then what?" DICKERSON replied, "Trust me. Then I'll come meet you. If you don't want to. Then you shouldn't it's fine I understand and are you sure you should meet? That could end up way worse than the pics did." Officer Rannebarger asked why it would be worse, and DICKERSON explained, "Meeting people on line. ESP older men. Police could be involved if you get caught I don't want that for you or for me. And we both have trust issues." Officer Rannebarger then replied, "Yeah maybe we shouldn't." DICKERSON said that it was up to her and then asked her last name. Officer Rannebarger provided the last name of Knight, and DICKERSON replied, "Damn. What's your dads last name? Same as yours?" Officer Rannebarger asked why he wanted the information, and DICKERSON explained that he "just have an idea and if I'm right then we can meet. Just take a few normal pics for me too." He then asked what apartment building Officer Rannebarger lived in and she confirmed it was Stratford Lakes. When she questioned him what his idea was, he said it didn't work and instructed her to call him.

51.    During the ensuing phone call, DICKERSON continued to ask numerous questions about Officer Rannebarger's prior sexual experiences and sexual preferences, including whether her ex-boyfriend had performed "oral," when she had last had sex, what the "kinkiest" thing she has

ever done was, and whether she was bi-sexual. He further stated that he loved giving "oral" and that she was overdue for sex. He also asked her to describe her body and asked what "down below" is like.

52.     When they discussed meeting, DICKERSON asked if they could meet in a public place first. Officer Rannebarger suggested the Kroger on Gender and Refugee Roads. DICKERSON continued to pressure her to send a nude picture and asked what she would be wearing if he came over. Officer Rannebarger reported she would wear shorts and a tank top. He stated they could meet at Kroger and then go back to her apartment. DICKERSON pressured again for nude photos, but Officer Rannebarger continued stating she wasn't comfortable. He then asked that she send revealing photos of herself in a tank top and of her buttock, and then he would leave to meet. Officer asked DICKERSON what type of vehicle he would be in and he reported that it would be a tan Jeep Wrangler.

53.     After the phone call, Officer Rannebarger sent two of the images DICKERSON had requested. One image was of Officer Rannebarger in a tank top. The second image was of her taking a picture of herself in jeans in front of a full-length mirror. DICKERSON replied and stated that she looked older, but it was a compliment. DICKERSON then stated, "Just saying hello right?" Officer Rannebarger agreed saying, "If that's all you want," and DICKERSON responded, "For now…Kroger at 3?" Officer Rannebarger confirmed the meet time and location.

54.     Agents of the Franklin County ICAC Task Force traveled to the predetermined meet location. Surveillance units were set in the parking lot of the Stratford Lake apartment complex and at the identified Kroger. At approximately 2:40pm, Officer Rannebarger spoke to DICKERSON on the phone, and he stated he would be there soon and asked when she was going to leave her apartment. He asked repeatedly what apartment number she was in. Officer Rannebarger reported she wasn't going to give the number until they met at Kroger. DICKERSON asked why that was, and Officer Rannebarger stated it was to make sure he was real. DICKERSON reported he was doing to the same and asked her to "help him out."

55.     During this phone call, a white dodge pickup truck with OH license plate 671ZHU was observed driving through and circling the parking lot of the Stratford Lake apartments. The truck left the complex and was observed parking in a CVS parking lot from which the Kroger parking lot and the Stratford Lakes apartment complex could be observed. A check of the vehicle

16

registration for the truck was conducted, and it was determined that the vehicle was registered to Larry Richard DICKERSON.

56.     During this time, Officer Rannebarger called DICKERSON and said that her mother was coming home. DICKERSON repeatedly asked if she could at least come say hello, and she continued to tell him no because her mother was almost home. DICKERSON then stated, "I was definitely ready for sex." Officer Rannebarger apologized and suggested they could do it another day. DICKERSON left the area at approximately 2:53pm.

57.     During the time that she was communicating with DICKERSON, Officer Rannebarger conducted a search of the phone number DICKERSON had provided to her in a law enforcement database that collects information regarding phone subscribers, residential addresses and other identifying information. According to the information that the database had collected, the listed subscriber of the phone number was Larry Richard DICKERSON. Records from the Ohio Bureau of Motor Vehicles further confirmed that DICKERSON was 56 years old and had a registered White Dodge truck with OH License plate 671ZHU, which is the same registration plate of the truck that was observed in the CVS parking lot on May 20. Officer Rannebarger further determined that in January of 2018, DICKERSON was convicted in the Delaware County Court of Common Pleas of Unlawful Sexual Conduct with a Minor. He was sentenced to 90 days of house arrest and up to five years of community control, and was currently being supervised by the Adult Parole Authority. Detailed in the sentencing entry, DICKERSON had a specific condition to not participate in any online chats. Officer Rannebarger reviewed the sentencing memorandum and discovered that DICKERSON utilized "Meetme" in his offense, and the victim was a 13-year-old female. It should be noted that "Meetme" and "Skout" are the same company and user profiles can be displayed on both applications simultaneously.

58.     It was further determined that DICKERSON was convicted in 2002 in federal court in the District of South Carolina for a violation of 18 U.S.C. § 2252(a)(5)(B) pertaining to child pornography. On April 24, 2002, DICKERSON was sentenced to 21 months of incarceration followed by three years of supervised release.

59.     During the course of Officer Rannebarger's communications with DICKERSON and her resulting investigation of him, another ICAC Detective received information about an older man who was attempting to communicate with two female minors from Delaware County via Instagram in or about early April of 2020. The minors would block the account, and the suspect

17

would reach out again on another account. The topic of the attempted contact involved the man suggesting that he be a "sugar daddy" to the minor females. Officer Rannebarger looked at the image of the suspect from the Instagram account and compared the image to the profile picture of DICKERSON's "MeetMe" account, and they appeared to be the same individual.

60.    On May 21, 2020, DICKERSON was taken into custody by the Adult Parole Authority for an independent investigation regarding the information received from the Franklin County ICAC, regarding the offender contacting minors through social networking sites. Officer Rannebarger and your affiant interviewed DICKERSON at his place of residence on the day that he was arrested by the Adult Parole Authority. DICKERSON was Mirandized and agreed to the interview. Officer Rannebarger informed him that there was an investigation concerning communications between a 15-year-old girl and himself. DICKERSON stated he had "no comment," that he did not have any sexual communication with her, and that he met her on the Meetme application. When asked how long he had been on the app, he stated it had been off and on and further stated, "It's been a problem with me." He further explained that he has been in therapy for PTSD for the past two and half years due to childhood sexual trauma & military sexual trauma, and went on to blame isolation from the COVID-19 pandemic for his online actions.

61.    When DICKERSON was asked further questions about his communications with the 15-year-old, he admitted that he had last chatted with her the day prior and that her name started with an H. He admitted that the conversation was about meeting, but claimed that she was trying to lead him into saying he wanted to meet her for sex. According to DICKERSON, he was only going to meet her to say hello and he did not go to the Kroger where they had agreed to meet. He explained that he parked in the CVS parking lot instead and repeatedly told himself, "I can't do this." He admitted, however, that he arrived early for the meeting and drove through the complex where he believed the child lived. When asked why he did that, he said he didn't know, but admitted that he had asked the child for her apartment number. After further discussing his therapy, DICKERSON again blamed issues related to Coronavirus and the resulting isolation and lack of therapy. He claimed that, during his interactions with the child, he was "scared to death" and kept telling himself he couldn't go through with it. When redirected to his communications with the child, DICKERSON claimed that she was pressuring him to say that he wanted sex but that he would not say it, even though "that stuff" was on his mind. When asked about his

comment to the child that he was ready for sex, DICKERSON first claimed that he was glad it didn't happen and then claimed to not remember making the statement. He repeatedly asserted that he didn't believe that he would had gone through with meeting the child, and that was why he didn't show up at the Kroger. When further questioned about his actions of driving around the apartment complex and parking at the CVS where he would have been able to see her arrive, DICKERSON claimed that he was sitting in the parking lot telling himself to go home. DICKERSON then requested an attorney and the interview then concluded.

62. At the conclusion of the field arrest, Officer Hoffman with the Adult Parole Authority informed Officer Rannebarger that he had seized an iPhone 10x, HP Probook 640 G2 laptop computer, and a Samsung St150f digital camera as part of the APA's investigation of DICKERSON's violation of his conditions of community control.

63. On May 28, 2020, Officer Rannebarger applied for and received a search warrant to examine the items seized by Officer Hoffman to include the iPhone 10x, HP Probook 640 G2 laptop computer and Samsung St150f digital camera. Your affiant conducted forensic examinations of these devices, and discovered that the phone number assigned to the iPhone 10x was the same phone number utilized in the communications with Officer Rannebarger. Your affiant further located two email accounts that were listed as user accounts in the phone: **rick53ohio@gmail.com** and **rick40ohio@hotmail.com**. These accounts were first accessed on the phone in December of 2019. The applications SnapChat, MeetMe and Kik messenger had previously been installed on the phone.

64. Through review of MeetMe and Skout's Law Enforcement Guides, your affiant learned that when registering an account with these two applications, the user has to input an email account. Additionally, the Law Enforcement Guides for these two applications state that a user's email account is one of the two unique application profile identifiers. Your affiant thus believes that information related to DICKERSON's utilization of these applications to communicate with minor females may be found within the content of the Google accounts associated with his Google email account that was identified on his phone, **rick53ohio@gmail.com.**

## VI. CHARACTERISTICS COMMON TO INDIVIDUALS WHO COMMUNICATE ONLINE AND CONSPIRE TO PRODUCE, RECEIVE AND COLLECT CHILD PORNOGRAPHY

50.     Based on my investigative experience related to child pornography and child exploitation investigations, and the training and experience of other law enforcement officers with whom I have had discussions, I know there are certain characteristics common to individuals who utilize internet-based forums to communicate with minors in a sexual manner:

Individuals who utilize internet-based forums to communicate with minors in a sexual manner to produce, receive or collect child pornography may receive sexual gratification, stimulation, and satisfaction from contact with children; or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs, or other visual media; or from literature describing such activity.

b. Individuals who utilize internet-based forums to communicate with minors in a sexual manner to produce, receive or collect child pornography may collect sexually explicit or suggestive materials, in a variety of media, including photographs, motion pictures/video, books, slides and/or other visual media. Individuals who have a sexual interest in children or images of children oftentimes use these materials for their own sexual arousal and gratification. Further, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

c. Individuals who utilize internet-based forums to communicate with minors in a sexual manner to produce, receive and collect child pornography usually possess and maintain any "hard copies" of child pornographic material, that is, their images, films, video tapes, magazines, correspondence, mailing or contact lists, books, recordings, etc., in the privacy and security of their home or some other secure location, such as online or "cloud" storage. Individuals who have a sexual interest in children or images of children sometimes retain pictures, films, photographs, negatives, magazines, correspondence, books, tape recordings, mailing lists, child erotica, and videotapes for many years, or alternatively may obtain and then purge such materials on a cyclical basis.

d. Likewise, individuals who utilize internet-based forums to communicate with minors in a sexual manner to produce, receive and collect child pornography often maintain their collections that are in a digital or electronic format in a safe, secure and private environment, such as on a computer or other digital device, or easily accessible online

"cloud" storage. These collections are often maintained for several years and are kept close by, usually at the collector's residence, to enable the individual to view the collection, which is valued highly. Recently it has become more frequent for those with a sexual interest in children or child pornography to store such materials in online storage accounts, rather than on their home computers or digital devices or to obtain and purge such materials on a cyclical basis.

e. Individuals who utilize internet-based forums to communicate with minors in a sexual manner to produce, receive and collect child pornography prefer not to be without their child pornography for any prolonged time period. This behavior has been documented by law enforcement officers involved in the investigation of child pornography throughout the world. Users will maintain their collections both off and online.

f. Based on my knowledge, training, and experience in child exploitation and child pornography investigations, and the experience and training of other law enforcement officers with whom I have had discussions, those who use internet-based forums to communicate with minors in a sexual manner often establish numerous online accounts. Many times, these different accounts have differing purposes, and accounts utilized to communicate with minors are often distinct from accounts associated with the individual's true identity. One of the reasons for this is to conceal their true identities from law enforcement or from the children they are seeking to communicate with and/or exploit.

## V. CONCLUSION

51.     Based on my training and experience, and the facts as set forth in this affidavit, there is probable cause to believe that evidence of a crime, contraband, fruits of crime, or other items illegally possessed, or property designed for use, intended for use, or used in committing a crime, will be found on the computer systems controlled by Google, Inc. Based on the aforementioned factual information, I respectfully submit that there is probable cause to believe that the Google, Inc. accounts described in Attachment B were used to attempt to employ a minor to engage in sexually explicit conduct for the purpose of producing a visual depiction of such conduct, attempt to receive child pornography, and to attempt to persuade, induce, entice or coerce a minor to engage in any sexual activity for which any person can be charged with a criminal offense. Accordingly, a search warrant is requested.

64.     Pursuant to Title 18, U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.  Because the warrant will be served on Google, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

Jeff Zech
Task Force Officer
Homeland Security Investigations

Sworn to and subscribed before me this 24 day of July 2020.

Chelsey M. Vascura
United States Magistrate Judge
United States District Court
Southern District of Ohio

22

**ATTACHMENT A**
**LIST OF ITEMS TO BE SEIZED**

I. Information to be disclosed by Google

1. To the extent that the information described in Attachment A is within the possession, custody, or control of Google, Inc., regardless of whether such information is stored, held or maintained inside or outside of the United States, and including any emails, records, files, logs, or information that has been deleted but is still available to the Google, Inc., or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Google is required to disclose the following information to the government for the account(s) or identifier(s) listed in Attachment B. Such information should include the below-described content of the subject accounts from December 1, 2019 to May 21, 2020.

    a. The contents of all e-mails stored in the account, including copies of e-mails sent to and from the account, draft e-mails, the source and destination addresses associated with each e-mail, the date and time at which each e-mail was sent, and the size and length of each e-mail;

    b. Any deleted emails, including any information described in subparagraph "a." above;

    c. All records or other information regarding the identification of the accounts (user profile), to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the types of service utilized, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative e-mail addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

    d. All records or other information stored by an individual using the Google accounts, including address books, contact and buddy lists, calendar data, pictures, videos and files. In addition, please provide the photos and videos in their original file format, including EXIF information;

    e. All records pertaining to communications between Google and any person regarding the account, including contacts with support services and records of actions taken;

    f. All Google chat archives stored on servers controlled by Google;

g. All privacy settings and other account settings; and

h. All records pertaining to any Circles in which the Google accounts listed in Attachment B participated, including communications and content shared with other individuals within such Circles, the other individuals within those Circles, and the account/subscriber information of the other individuals within those Circles.

II. Information to be seized by the government

1.      All information described above in Section I, including correspondence, records, documents, photographs, videos, electronic mail, chat logs, and electronic messages, that constitutes evidence of a crime, contraband, fruits of crime, or other items illegally possessed, or property designed for use, intended for use, or used in committing violations of 18 U.S.C. §§ 2251, 2252 or 2422(b), including, for each account or identifier listed on Attachment B, information pertaining to the following matters, including attempting and conspiring to engage in the following matters:

a. Any person knowingly producing, transporting, distributing, receiving, possessing or accessing visual depictions of minors engaged in sexually explicit conduct or attempting to coerce or entice a minor to engage in illegal sexual activity;

2.      Credit card and other financial information including but not limited to bills and payment records;

3.      Evidence of who used, owned, or controlled the account(s) or identifier(s) listed in Attachment B;

4.      Evidence indicating how and when the email account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the email account owner;

5.      Passwords and encryption keys, and other access information that may be necessary to access the account(s) or identifier(s) listed in Attachment B and other associated accounts.

6.      Evidence of person(s) who communicated with the account regarding matters pertaining to child pornography or sexual exploitation of minors.

<u>III. Method of Service</u>

Responsive data disclosed pursuant to this search warrant is to be served by sending to Task Force Officer Jeff Zech, Franklin County Sheriff's Office, Internet Crimes Against Children Unit, 410 S. High Street, Columbus, Ohio 43215, notwithstanding 18 U.S.C. § 2252A or any similar statute or code.

**ATTACHMENT B**

## PLACE/ACCOUNT TO BE SEARCHED

This warrant applies to all information related to or associated with the Google account (including but not limited to Google Plus, Gmail, and Google Drive) rick53ohio@gmail.com that are stored at premises owned, maintained, controlled, or operated by Google, Inc., a company headquartered at 1600 Amphitheatre Parkway, Mountain View, CA 94043.

Google Reference No. 3794261 preservation request rick53ohio@gmail.com

26